UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 13 B 35761 |
| MARZIEH BASTANIPOUR, | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| EBRAHIM FARAHANI, | ) | |
| | ) | Adv. No. 13 A 1434 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARZIEH BASTANIPOUR, | ) | Judge Pamela S. Hollis |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter comes before the court on the complaint filed by Plaintiff Ebrahim Farahani against Defendant Marzieh Bastanipour. Farahani seeks to exclude from discharge under 11 U.S.C. § 523(a)(4) any debt that Bastanipour owes to him as a result of a real estate transaction that closed on September 26, 2008.[1] The court heard testimony from three witnesses, reviewed the admitted exhibits and read Bastanipour's post-trial brief.[2] For the reasons stated below, the court enters judgment for Defendant Marzieh Bastanipour.

---

[1] The complaint originally sought relief under 11 U.S.C. § 523(a)(2) as well as § 523(a)(4). The court concluded at the end of the trial that since no evidence was submitted as to fraud regarding a laptop and gold coins, the only remaining cause of action was under § 523(a)(4). Even if the court did find that Bastanipour engaged in false pretenses, made a false representation or committed fraud, the same judgment would be entered. Because there is no evidence that Farahani would have cancelled the transaction had he known the truth about her ownership, he did not prove that Bastanipour's actions <u>caused</u> a debt to be incurred.

[2] On the day post-trial briefs were due, Farahani brought a motion to extend the deadline. The motion was denied.

## JURISDICTION

Under 28 U.S.C. § 1334, district courts have original and exclusive jurisdiction of all cases under Title 11. The underlying bankruptcy case was automatically referred to this court pursuant to Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois, as authorized by 28 U.S.C. § 157(a).

This adversary proceeding, filed within the bankruptcy case, seeks a finding of nondischargeability pursuant to 11 U.S.C. § 523(a)(4). It is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Since a proceeding to determine dischargeability "stems from the bankruptcy itself," Stern v. Marshall, 564 U.S. 462, 499 (2011), this court has both the statutory and the constitutional authority to enter final judgment on the complaint.

## FINDINGS OF FACT

Plaintiff Ebrahim Farahani is a resident and citizen of California. Amended Complaint and Answer ¶ 6. He immigrated to the United States around 1992, lived in the Chicago area for ten years, and then moved to California. Tr. at 64-65. At the time of trial, Farahani was 65 years old. Tr. at 62.

Defendant Marzieh Bastanipour is a resident of Chicago. Amended Complaint and Answer ¶ 7. She and Farahani are former in-laws – Farahani was married to Bastanipour's sister, Stedie. He also served in the army with her brother, Michael. Tr. at 30-31.

While living in the Chicago area, Farahani owned a business with Michael for several years. Tr. at 68-70. The business was organized as a corporation in which both Farahani and Michael were officers. Tr. at 120. During this same time period, Farahani bought a home in Glenview, Illinois. When he bought the home, he signed a real estate contract and a mortgage,

as well as an agreement with a broker and all required closing documents. He read none of these papers. Tr. at 97-98.

Farahani lived in the house in Glenview for three or four years with his wife Stedie, but eventually quitclaimed the home to her. Tr. at 77-78. They separated a few years later. Tr. at 79.

After moving to California, Farahani bought another business, a discount store, which he operated for about five years. Tr. at 71-72. He incorporated that business and read the associated documents. Tr. at 98-99. After the discount store, Farahani operated a pizza shop for three and a half years and a women's clothing store for another year. Tr. at 74-75. For each of these businesses he signed a lease, which he read before signing. Tr. at 99.

At all times during the events recounted below, Bastanipour was a real estate agent licensed under Illinois law. Amended Complaint and Answer ¶ 9. Farahani knew she was a real estate agent, and believed she was acting as his agent. Tr. at 30.

In 2007, Farahani visited Chicago. Bastanipour asked him to have lunch with her. Tr. at 18; Amended Complaint and Answer ¶ 8. She invited him to see a condominium. Tr. at 18-19. He told her that he did not have any money to buy property, or any intention of doing so, "[a]nd she said, no, just go look." Tr. at 19, line 3. So they looked at several apartments.

Sometime later, Bastanipour called Farahani "and she said, do you remember those condos I show you? I said, yeah, I remember that. So one of them was involved with the River Road. I remember that one because that was the nicest one I see . . . [o]n top of the Chicago River." Tr. at 24, lines 7-11 and 14. Bastanipour asked if he wanted to buy the apartment, and Farahani told her he had no interest in purchasing it, both because he didn't have the money and because he had no plans to live in Chicago. She told him that no down payment was required,

3

that she would rent it out for him, and that the mortgage would have a low interest rate. Tr. at 25-26. This apartment, located at 800 South Wells Street, Unit 720, in Chicago, would be an investment property for Farahani. Tr. at 26.

Bastanipour asked Farahani to mail checks to her in order to make the purchase. He first sent a check for $15,000. After three or four months, she told him she needed another check for $14,000. Neither of these checks were cashed. Tr. at 27-28.

Then Bastanipour told Farahani that despite her earlier promise that no down payment would be required, he would need to make one. He sent her a check for $19,500. Tr. at 28-29. "And after a while she calls and she said that's not enough. You got to send more. And then I sent one check for 7,000, and another one for . . . 9,000." Tr. at 29, lines 7-9 and at 30, line 3. These checks were all written on Farahani's line of credit. Tr. at 30. Farahani eventually provided earnest money in the total amount of $46,000. Tr. at 38; **Pl. Ex. 1**.

Sometime after that, Bastanipour presented Farahani with two documents to sign. She folded them up in a manner that prevented him from seeing what the document was unless he took it and unfolded it. Tr. at 32-34. "First time I didn't ask anything, but second time I want to – I said, what is that for? She get angry to me. There is no need to review. I don't want to cheat you or something. I said, okay. I sign it. I sign the paper." Tr. at 33, lines 1-5. **Pl. Ex. 2.**

Q: So you didn't unfold and read the document that you were signing –
A: No.
Q: -- because you didn't want your friend mad at you?
A: That's right. Once I asked her, she get mad at me. I said, okay, I sign it.

4

Tr. at 101, lines 18-24.[3] Farahani did not expect that Bastanipour would defraud him, since she was a member of his family. Tr. at 105. Indeed, he expected that she would ensure the price he was paying was fair. Tr. at 107. He asked her whether the price was fair and she told him "yeah, everything. Trust me . . ." Tr. at 107, line 9.

Farahani did not realize that he had signed a contract to purchase the property located at 800 South Wells. Tr. at 36. Line 1 of the contract identifies the seller as "Owner of Record." Someone signed the contract as seller, although both the printed and signed names are illegible. **Pl. Ex. 2**.

Farahani also signed a lease, as lessee, for that same apartment. The term of the lease ran from January 2008 to December 2010 at a monthly rent of $1,600. **Def. Ex. A**. Farahani testified that he signed the lease when she handed it to him, folded up, and that he didn't read it. "I don't want to make her mad, that's why I just sign it and give it to her." Tr. at 102, lines 3-4. Although the term of the lease began in January 2008, the lease itself is undated.

Around the same time, Bastanipour asked Farahani to come to Chicago to partner with her in a charitable business project. Tr. at 83. He moved back to the city from California and stayed at the apartment at 800 South Wells for about six months. Tr. at 85-88. Farahani first testified that he lived in the apartment starting in March 2008, and then later testified that he did

---

[3] Farahani's ex-wife Stedie also testified that around 2002 or 2003, her sister came over and cooked her dinner, then asked her to sign a document while she was sleeping.
> The next day I was driving to work and then I remember I had a dream signing something. Was it a dream it, was not a dream? So I was questioning myself. And I contacted Marzieh. And I asked her, did you have me sign something? And she said, what about it? I said, I want to know. She said, none of your business. I said, no, I want to know. Did you have me sign something while I was sleeping? She said, yes.
> So what – so I said, what was that for? She said, none of your business. I said, I want to know what I have signed. And she said, it's a contract for a condo.

Tr. at 129, lines 3-15.

not live in the apartment until after he purchased it in August 2008. Tr. at 103. According to Stedie, Farahani moved into the apartment in March 2009. Tr. at 128.[4]

At the request of Farahani's lender, Wells Fargo, the apartment was appraised in July 2008. The appraiser valued the apartment at $230,000. **Def. Ex. D**; **Pl. Ex. 5**. This was exactly the same value as the sale price. **Def. Ex. B, C**. Tr. at 60; **Pl. Ex. 1**. The appraiser used five comparable sales; one of the sales was from the same building as the subject apartment, 800 South Wells. **Def. Ex. D**. Farahani did not see the appraisal until after the closing. Tr. at 105-06.

Sometime in August 2008, Bastanipour told Farahani that they were ready to close on the condominium and that he should come to Chicago. Amended Complaint and Answer ¶ 21.

At the closing, Farahani signed the HUD statement, a document he saw for the first time that day. Tr. at 37. That was also the first time he learned that Bastanipour was the owner of the apartment he was about to purchase. Id. Prior to the closing on September 26, 2008, Bastanipour had not told Farahani that she owned the property. Tr. at 37-38.

Bastanipour had already received Farahani's $46,000 in earnest money. Farahani brought an additional check in the amount of $5,539.14 to the closing. Tr. at 38-39.

At the closing, Farahani asked Bastanipour about the fact that she was the owner. "[A]nd she said I am going to surprise you." Tr. at 39, lines 17-18. He then tried to ask the closer a

---

[4] In her post-trial brief, Bastanipour referred to checks written on Farahani's business account as evidence that he paid rent for the apartment in early 2008. Copies of these checks were filed on the adversary docket, but they were not introduced into evidence at trial. While a court may take judicial notice of its own docket entries, Griffin v. U.S., 109 F. 3rd 1217, 1218 n.1 (7th Cir. 1997), the Federal Rules of Evidence limit judicial notice to facts that are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." F.R.E. 201(b). A copy of the front of a check, with nothing more, is not a source whose accuracy cannot reasonably be questioned. Filing the copy on the court docket does not transform it into an appropriate source.

question, and Bastanipour told him, "anything you ask you me [sic], I tell you. Don't ask her anything." Tr. at 40, lines 8-9.

> Q: All right. And did you try to get out of the closing at all; in other words, not to buy the property when you found out that it was owned by your former sister-in-law?
>
> A: No. She got mad. She said if you do that, you going to lose all the money invested here.
>
> . . . .
>
> Q: You were going to lose the 46,000?
>
> A: That's right.
>
> Q: And Ms. Bastanipour said you wouldn't lose anything if you close? Yes?
>
> A: Yes.

Tr. at 40, lines 10-25.

After the closing, Bastanipour took all the documents, including the note and the mortgage. Tr. at 42.

Shortly after buying the apartment, Farahani talked to the person who was trying to help him rent it out. That person guessed that the value of the apartment was about $100,000 to $110,000. "[I]f you're lucky." Tr. at 44, lines 16-17. See also Tr. at 95-96.

Farahani told Bastanipour about this conversation, and "after that she tried to avoid me. And any time I called her, she started – and talking very bad to me. That's why I – you know, sometimes I called five, six times, not answering, just open and closing the phone." Tr. at 45, lines 9-13.

Sometime in 2009, Farahani signed a two year lease to rent an apartment from Bastanipour at 211 East Ohio Street in Chicago, at a monthly rental of $1,250. Request to Admit 17, at EOD 66; admitted by Order Granting Motion to Compel, at EOD 75.

7

In August 2009, Farahani called Wells Fargo Home Mortgage and asked for a copy of his mortgage. That was when he learned that the interest rate was 6.375%. Tr. at 43. Bastanipour had initially told him she would get a mortgage with a low interest rate, and later told him the rate would be 5%. Tr. at 31.

Farahani turned to his former brother-in-law, Michael Bastanipour, for help. Tr. at 51. In October 2009, Michael wrote a letter to Bastanipour laying out the information he learned from Farahani as well as all the documents associated with the purchase of 800 South Wells. Tr. at 111; **Pl. Ex. 11**.[5] Michael spoke with Bastanipour on the phone about Farahani's allegations, and she eventually admitted that she had done the things described in the letter. Tr. at 114.

Michael believed the price Farahani paid for the apartment "was pretty high." Tr. at 122, lines 4-5. He thought Wells Fargo's appraisal was not legitimate, although he is not an appraiser. Tr. at 122. Instead, he asked "people in the business, real estate people," for their opinion of the value of the apartment. Tr. at 123, lines 8-9. Michael did not know whether these "real estate people" were appraisers. Tr. at 123.

Stedie testified that in 2009, she got in touch with a realtor to see about selling the apartment, and was told that similar condominiums in that building were selling for around $115,000. Tr. at 126. She believed that the price Farahani had paid was inflated and that the Wells Fargo appraisal was flawed because none of the comparables were from the same building. Tr. at 132-134.

In order to pay the mortgage and assessments on the condominium, Farahani used the funds that he received for the sale of his discount store business. Tr. at 56. He also liquidated a

---

[5] Plaintiff's Exhibit 11 was admitted for the purpose of showing that notice of a demand was provided to Bastanipour. It was not admitted for the truth of the matters asserted therein. Tr. at 115-116.

$15,000 IRA. Tr. at 57-58. He has no savings left and eventually filed his own petition for relief under the Bankruptcy Code. Tr. at 59.

Bastanipour filed for relief under Chapter 7 of the Bankruptcy Code on September 9, 2013.

## CONCLUSIONS OF LAW

Farahani bears the burden of proof in this proceeding. He must demonstrate by a preponderance of the evidence that any debt Bastanipour owes to him should be excluded from her discharge pursuant to 11 U.S.C. § 523(a)(4). Grogan v. Garner, 498 U.S. 279, 286-87 (1991).

According to § 523(a)(4):

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— . . . .

    (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . . .

There is no allegation that Bastanipour embezzled from Farahani, or that she committed larceny. Therefore, the issue before the court is whether she incurred a debt to Farahani for fraud or defalcation while acting in a fiduciary capacity.

Exceptions to discharge are narrowly construed in favor of the debtor. In re Chambers, 348 F. 3rd 650, 654 (7th Cir. 2003) (citation omitted). This is especially true when the exception under consideration is § 523(a)(4). "The Supreme Court taught in Davis v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), that the non-dischargeability exception's reference to fiduciary capacity was strict and narrow. As Justice Cardozo wrote for the Court, the debtor must have been a trustee before the wrong and without reference thereto." In re Berman, 629 F. 3rd 761, 767 (7th Cir. 2011) (quotations omitted) (footnote omitted explaining that the Supreme Court was interpreting a predecessor statute).

9

"To satisfy § 523(a)(4), a creditor must prove that (1) the debtor acted as a fiduciary to the creditor at the time the debt was created, and (2) the debt was caused by fraud or defalcation. In re Jahrling, 816 F. 3rd 921, 925 (7th Cir. 2016) (quotations omitted).

The first question, therefore, is whether a fiduciary relationship existed between Bastanipour and Farahani.[6]

Bastanipour is a real estate agent. An Illinois appellate court wrote "that the business of being a realtor is not one containing an element of public interest so as to require him to deal as a fiduciary with everyone. Before a fiduciary duty arises it must be proven that a realtor has been employed by someone and that he is therefore an agent for them." Blocklinger v. Schlegel, 58 Ill. App. 3rd 324, 327 (Ill. App. Ct. 1978), citing Fish v. Teninga, 161 N.E. 515 (Ill. 1928).

Farahani knew that real estate agents could be hired by written agreement, as he had signed such an agreement when he purchased a home in Glenview a decade earlier. No written contract was introduced into evidence to support a finding that Farahani employed Bastanipour.

This lack of a formal, written agent-buyer agreement, however, does not doom Farahani's claim that a fiduciary relationship existed.

According to the Illinois Real Estate License Act of 2000, holders of a real estate license "shall be considered to be representing the consumer they are working with as a designated agent for the consumer unless: (1) there is a written agreement between the sponsoring broker and the consumer providing that there is a different relationship; or (2) the licensee is performing only ministerial acts on behalf of the consumer." 225 ILCS 454/15-10 (West 2016). Therefore, Illinois law does not require a written agreement between the licensee and the consumer for the licensee to be considered to be representing the consumer. "The only requirement to form an

---

[6] A creditor may prove instead that an express trust existed, but Farahani neither alleged the existence of an express trust in his complaint nor argued it at trial.

10

agency relationship between a broker and his or her client is an act by the broker and consent by the principal. Consent may be oral, written, or implied from the conduct of the parties. An agency relationship may be established by circumstantial evidence, including the situation of the parties, their acts, and other relevant circumstances." In re Bhayani, 293 B.R. 911, 916 (Bankr. N.D. Ill. 2003) (citations omitted) (Schmetterer, J.).

Neither of the two exceptions to representation described above apply in this case. No written agreement was introduced into evidence to show that there was a different relationship. Furthermore, Bastanipour's acts as a licensee working with Farahani went far beyond ministerial.[7] She brought Farahani to see various apartments, she gave him the real estate contract to sign, she called him when the closing approached and told him to attend, she was at the closing herself, and she took all the documents with her afterward.

Under Illinois law, therefore, Bastanipour represented Farahani. Since she was his agent, a fiduciary duty arose from this relationship. This was the sort of fiduciary relationship that qualifies under the Bankruptcy Code, because Bastanipour's obligations to Farahani existed prior to any wrongdoing. See In re Frain, 230 F. 3rd 1014, 1017 (7th Cir. 2000); Matter of Marchiando,

---

[7] "Ministerial acts" are defined as:

> [T]hose acts that a licensee may perform for a consumer that are informative or clerical in nature and do not rise to the level of active representation on behalf of a consumer. Examples of these acts include without limitation (i) responding to phone inquiries by consumers as to the availability and pricing of brokerage services, (ii) responding to phone inquiries from a consumer concerning the price or location of property, (iii) attending an open house and responding to questions about the property from a consumer, (iv) setting an appointment to view property, (v) responding to questions of consumers walking into a licensee's office concerning brokerage services offered or particular properties, (vi) accompanying an appraiser, inspector, contractor, or similar third party on a visit to a property, (vii) describing a property or the property's condition in response to a consumer's inquiry, (viii) completing business or factual information for a consumer on an offer or contract to purchase on behalf of a client, (ix) showing a client through a property being sold by an owner on his or her own behalf, or (x) referral to another broker or service provider.

225 ILCS 454/1-10 (West 2016).

13 F.3rd 1111, 1115 (7th Cir.), cert. denied sub nom. Illinois Dept. of the Lottery v. Marchiando, 512 U.S. 1205 (1994) (citations omitted) ("fiduciary relation that has an existence independent of the debtor's wrong"). As Farahani's licensed real estate agent, Bastanipour was in a fiduciary relationship "that imposes real duties in advance of the breach." Id. at 1116.

Having established that Bastanipour acted as a fiduciary for purposes of § 523(a)(4), Farahani must also prove that any debt Bastanipour owed to him was caused by fraud or defalcation while acting in that fiduciary capacity.

The Supreme Court recently provided "authoritative guidance" as to what constitutes a defalcation, "holding that defalcation requires proof of 'a culpable state of mind . . . involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior.'" Bullock v. BankChampaign, N.A., ___ U.S. ___, 133 S. Ct. 1754, 1757 (2013), quoted in Jahrling, 816 F. 3rd at 925. "[T]he term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. . . . Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." Bullock, 133 S. Ct. at 1759 (citation omitted).

Defalcation "differs from fraud in not requiring a false statement." Stoughton Lumber Co., Inc. v. Sveum, 787 F. 3rd 1174, 1176 (7th Cir. 2015). And as distinguished from embezzlement and larceny, defalcation "can encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity." Bullock, 133 S. Ct. at 1760.

Farahani argued at trial that the defalcation committed while Bastanipour was acting in a fiduciary capacity was her selling the apartment to him at an inflated value. For this argument to prevail, the evidence must show that Bastanipour consciously disregarded the risk that selling Farahani the apartment for the price of $230,000 would violate a fiduciary duty.

The evidence adduced at trial does not support this argument. The only contemporaneous appraisal introduced into evidence was prepared at the request of Farahani's third party lender, Wells Fargo. The appraiser found the value of the apartment to be equal to Farahani's purchase price. Although Farahani tried to argue that the appraisal's comparable sales were not valid, one of those comparable sales was actually from the <u>same building</u> as Farahani's apartment, and it sold for a higher price.

After-the-fact guesses about value by an unnamed person who was helping Farahani rent the property, or by "people in the business, real estate people," are not sufficient evidence in the face of a timely appraisal prepared at the request of Farahani's lender and done by a certified appraiser. Farahani's argument that Bastanipour committed defalcation by selling the apartment to him at an egregiously high price must fail.

As the court indicated at the end of the trial, however, there was no evidence that Bastanipour disclosed that she was the owner of the apartment until Farahani was at the closing. Even if he had unfolded the real estate contract – and the court finds it difficult to believe that a man who has signed contracts and leases that he read and run more than one business was so cowed by his former sister-in-law that he could not even unfold a document to see what he was signing – that contract said the seller was "owner of record." Additionally, the printed and signed names at the bottom of the contract under "SELLER" were illegible – if they were even on the contract at the time Farahani signed it. He may have been able to discern that she was the owner

of the apartment from the lease he signed, but the evidence did not establish whether he signed the undated lease prior to the closing, even though the lease term began in January 2008. Finally, although the appraisal also disclosed that Bastanipour was the owner of record, Farahani testified that he did not receive the appraisal until after the closing.

Was Bastanipour's failure to disclose her ownership a fraud or defalcation of her fiduciary duties such that Farahani's claim for the return of his earnest money could be a nondischargeable debt? If Bastanipour consciously disregarded the risk that keeping her ownership a secret from Farahani would result in the violation of her fiduciary duty, then the answer is yes.

The Real Estate License Act states that "[a] licensee representing a client shall . . . (2) Promote the best interest of the client by: . . . (C) Disclosing to the client material facts concerning the transaction of which the licensee has actual knowledge, unless that information is confidential information. . . [and] (F) Acting in a manner consistent with promoting the client's best interests as opposed to a licensee's or any other person's self-interest." 225 ILCS 454/15-15 (West 2016). The Act abrogated the common law fiduciary duties that had been applied to real estate agents. 225 ILCS 454/15-5(a) (West 2016) ("This Article 15 applies to the exclusion of the common law concepts of principal and agent and to the fiduciary duties, which have been applied to managing brokers, brokers, and real estate brokerage services."). Fiduciary duties are now defined by the statute. "A broker owes a duty of loyalty and honesty to his or her client, and must not put personal interests ahead of those of a client. Brokers must disclose all material facts related to a transaction, of which they have actual knowledge." Bhayani, 293 B.R. at 917-18 (citations omitted).

The evidence presented at trial shows that Bastanipour violated her fiduciary duties to Farahani. She did not promote Farahani's best interest when she failed to disclose her ownership to him, for this was a material fact. She also failed to promote his best interest when she acted in a manner consistent with promoting her own self-interest rather than his.

In order for any debt Bastanipour might owe him as a result of these violations to be nondischargeable, Farahani must prove by a preponderance of the evidence that Bastanipour consciously disregarded (or was willfully blind to) the substantial and unjustifiable risk that her conduct would turn out to violate a fiduciary duty. Her actions must go beyond negligence. As the Seventh Circuit told us in Jahrling, the question is whether the risks to her client from violating her fiduciary duties "were so obvious that [she] must have recognized them yet forged ahead recklessly, acting in a way that amounted to a 'gross deviation' from the standards expected . . . in a fiduciary role." 816 F. 3rd at 927.

There is little doubt that for a licensee to hide her ownership of the property that her client is about to buy is a gross deviation from the standards set forth in the Real Estate License Act. If Bastanipour didn't know that, she should have. The statute is quite clear that she has a duty to disclose material facts as well as a duty to promote her client's best interest over her own.

> A broker can neither purchase from, nor sell to, his principal unless the latter expressly assents thereto or, with full knowledge of all the facts and circumstances, acquiesces in such transaction. Even when the principal gives his assent to a purchase or sale by the broker, the latter's actions throughout must be characterized by the utmost good faith.

Letsos v. Century 21-New West Realty, 285 Ill. App. 3rd 1056, 1068-69 (Ill. App. Ct. 1996) (citation omitted) (decided under the common law duties of good faith and loyalty, prior to the Real Estate License Act of 2000).

Yet even if Farahani proved that Bastanipour consciously disregarded the risk that her actions were a gross deviation from the expected standards, he cannot prove that her actions

caused his loss and thus any debt she owes him is a debt <u>for</u> defalcation while acting in a fiduciary capacity. This is an inescapable conclusion, because there is no evidence that Farahani would have pulled out of the deal if Bastanipour had told him she was the seller.

We know that on the day of the closing he did not try to cancel the transaction:

> Q: And did you try to get out of the closing at all; in other words, not to buy the property when you found out that it was owned by your former sister-in-law?
>
> A: No. She got mad. She said if you do that, you going to lose all the money invested here.

This is not the same as asking Farahani whether he would have gone forward with the deal had he known from the beginning that Bastanipour owned the apartment. Would Farahani have sent Bastanipour $46,000 in earnest money and gone through with the purchase if he knew she was the owner? The court told the parties at the end of the trial that this was the key question:

> And I basically have a breach of fiduciary duty by a licensed real estate broker to your client, to the claimant, a breach of fiduciary duty, but I have no evidence that if he had known that she was the owner that he would not have gone forward with the deal.

Tr. at 143, line 23 – p. 144, line 3.

That missing fact is the linchpin to finding that any debt arising from the breach of her fiduciary duties is nondischargeable.

The court acknowledges a pattern in Farahani's interactions with Bastanipour. If he questioned her actions or her motives, she got angry at him, and he backed down. Whether he was afraid of her, cowed by her, or felt some other emotion, the court does not know. Based on those other interactions it is likely that he would have gone ahead with the purchase rather than risk her wrath. Indeed, even after the closing, he signed a two year lease for another apartment she owned, at 211 East Ohio Street in Chicago.

16

But we do not know for certain what he would have done because there was no testimony on this point. Therefore, there is no causation link between Bastanipour's defalcation while acting in a fiduciary capacity and any claim for damages that Farahani might have against her. Jahrling, 816 F. 3rd at 925 ("the debt was caused by fraud or defalcation") (emphasis added).

## CONCLUSION

For all of the reasons stated above, the court finds that Bastanipour was Farahani's real estate agent, and thus the parties had a fiduciary relationship. By consciously disregarding the risk that keeping her ownership a secret from Farahani would turn out to violate her fiduciary duties to him, Bastanipour committed a defalcation. There is no testimony, however, that Farahani would not have gone forward with the transaction had he learned in a timely manner that Bastanipour was the owner. Therefore, Farahani did not prove by a preponderance of the evidence that Bastanipour's defalcation caused a debt. Judgment will be entered for the Defendant, Marzieh Bastanipour.

Date: JUN - 7 2016

PAMELA S. HOLLIS
United States Bankruptcy Judge